**2013-1660**

In The

# United States Court Of Appeals

## For The Federal Circuit

# IN RE RUSSELL G. ROSS and
# REBECCA B. KANE

Appeal from the United States Patent and Trademark Office, Patent
Trial and Appeal Board in Serial No. 10/975,277.

––––––––––––––––

## BRIEF OF APPELLANTS

––––––––––––––––

Roberta Jacobs-Meadway
Bridget Heffernan Labutta
David V. Radack
Philip E. Levy
ECKERT SEAMANS
 CHERIN & MELLOTT, LLC
Two Liberty Place, 22nd Floor
50 South 16th Street
Philadelphia, PA 19102
(215) 851-8400

*Dated: November 18, 2013*          *Attorneys for Appellants*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellants certifies the following:

1. The full name of every party represented by me is:

   Russell G. Ross
   Rebecca B. Kane

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Phoenix Intangibles Holding Company
   a Delaware corporation
   Two Greenville Crossing
   400 Kennett Pike, Suite 220
   Greenville, Delaware 19807

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are:

   Giant Eagle, Inc.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the agency action or are expected to appear in this court are:

   Roberta Jacobs-Meadway, Esq.
   Bridget Heffernan Labutta, Esq.
   David V. Radack, Esq.
   Philip E. Levy, Esq.


Dated: November 18, 2013          /s/ Roberta Jacobs-Meadway
                                  Roberta Jacobs-Meadway

                                  **Attorney for Appellants**

i

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF CONTENTS................................................................... ii

TABLE OF AUTHORITIES ................................................................v

I.    STATEMENT OF RELATED CASES...........................................1

II.   JURISDICTIONAL STATEMENT ..............................................1

III.  STATEMENT OF ISSUES .............................................................2

IV.   STATEMENT OF CASE .................................................................2

V.    STATEMENT OF FACTS ...............................................................5

      A.    The Claimed Invention...........................................................5

      B.    The **fuelperks!®** Program...................................................8

      C.    The Prosecution History.......................................................10

      D.    The Cited References ...........................................................10

      E.    The Decisions by the Patent Trial and Appeal Board.........18

VI.   SUMMARY OF ARGUMENT.....................................................19

VII.  ARGUMENT..................................................................................20

      A.    Standard of Review  .............................................................20

      B.    The Board Erred by Rejecting Appellants' Secondary
            Considerations Evidence .....................................................21

1.      Secondary Considerations are Afforded Substantial Weight ....................................................................22

2.      The Board Failed to Give Proper Weight to Appellants' Substantial and Relevant Secondary Considerations Evidence ...................................................................24

        a.      Commercial Success ......................................................25

        b.      Unexpected Results and Fulfilling An Unsolved Need ...................................................................29

        c.      Industry Recognition ...................................................32

3.      Appellants Demonstrated a Clear and Unambiguous Nexus Between the Secondary Considerations Evidence and the Unique Features of the Claimed Invention .................33

        a.      The **fuelperks!®** Program Has Enjoyed Commercial Success, Had an Unexpected Result, Fulfilled an Unsolved Need, and Garnered Industry Recognition ......................................................34

        b.      The Secondary Considerations Evidence is Directly Related and Attributable to the Unique Features of the Claimed Invention ................................35

        c.      Appellants Have Met Their Burden of Showing Nexus ...................................................................38

C.      The Board Failed to Establish that the Claimed Invention was Obvious .............................................................................40

1.      The Prior Art Does Not Teach the Unique Features of the Claimed Invention .................................................................41

2.      The Board Erred by Adopting the Examiner's Official Notice of References that Purportedly Suggest an Obvious Element of the Claimed Invention ...........................42

3.      The Board Failed to Establish a *Prima Facie* Case of Obviousness ..........................................................................45

VIII.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................49

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*In re Ahlert,*
    424 F.2d 1088 (CCPA 1970)..................................................42, 43

*Ex parte Anderson*,
    21 USPQ2d 1241 (Bd. Pat. App. & Inter. 1991) ........................26

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
    716 F.2d 281 (Fed. Cir. 1985), *cert. denied*,
    475 U.S. 1017, 106 S. Ct. 1201, 89 L.Ed.2d 315 (1986) .............23

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*,
    555 F.3d 984 (Fed. Cir. 2009) ........................................34

*In re Beasley,*
    117 Fed. Appx. 739 (Fed. Cir. 2004) ...........................43

*Ex parte Clapp,*
    227 USPQ 972 (Bd. Pat. App. & Inter. 1985) ............................46

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938)................................................20, 21

*Crocs, Inc. v. ITC,*
    598 F.3d 1294 (Fed. Cir. 2010) ....................................47

*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.,*
    851 F.2d 1387 (Fed. Cir. 1988) ....................................23

*Dickinson v. Zurko,*
    527 U.S. 150 (1999) ...............................................20

*In re Glatt Air Techniques,*
    630 F.3d 1026 (Fed. Cir. 2011) .............................*passim*

*Graham v. John Deere Co. of Kansas City,*
    383 U.S. 1 (1966)...................................................................40, 41

*Hearing Components, Inc. v. Shure Inc.,*
    600 F.3d 1357 (Fed. Cir. 2010) ...................................................25

*In re Huai-Hung Kao,*
    639 F.3d 1057 (Fed. Cir. 2011) .......................................24, 33, 35

*In re Huang,*
    100 F.3d 135 (Fed. Cir. 1996) ....................................................38

*In re Jones,*
    958 F.2d 347 (Fed. Cir. 1992). ...................................................46

*In re Jung,*
    637 F.3d 1356 (Fed. Cir. 2011) ...................................................40

*KSR Int'l Co. v. Teleflex, Inc.,*
    550 U.S. 398 (2007)...............................................................40, 47

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,*
    688 F.3d 1342 (Fed. Cir. 2012) ...................................................40

*In re Kotzab,*
    217 F.3d 1365 (Fed. Cir. 2000) .......................................20, 41, 46

*Leo Pharmaceutical Products Ltd. v. Rea,*
    726 F.3d 1346 (Fed. Cir. Aug. 12, 2013) ........................ 34-35, 48

*Ex parte Levengood,*
    28 USPQ2d 1300 (Bd. Pat. App. & Inter. 1993) .........................46

*In re Mageli,*
    470 F.2d 1380 (CCPA 1973)..................................................33, 35

*Ormco Corp. v. Align Tech., Inc.,*
    463 F.3d 1299 (Fed. Cir. 2006) ...................................................22

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
    520 F.3d 1358 (Fed. Cir. 2008) ....................................................22, 23, 29, 32

*Pfizer Inc. v. Teva Pharms. U.S.A., Inc.,*
    882 F. Supp. 2d 643 (D. Del. 2012) ...........................................................32

*Rambus, Inc. v. Rea,*
    2013 U.S. App. LEXIS 19500 (Fed. Cir. Sept. 24, 2013) ...........................34

*In re Remark,*
    15 USPQ2d 1498 (Bd. Pat. App. & Inter. 1990)....................................24, 33

*Rolls-Royce, PLC v. United Techs. Corp.,*
    603 F.3d 1325 (Fed. Cir. 2010) ............................................................22, 46

*Spectralytics, Inc. v. Cordis Corp.,*
    649 F.3d 1336 (Fed. Cir. 2011) ............................................................22, 37

*Stratoflex, Inc. v. Aeroquip Corp.,*
    713 F.2d 1530 (Fed. Cir. 1983) ....................................................................22

*In re Sullivan,*
    498 F.3d 1345 (Fed. Cir. 2007) ....................................................................20

*In re Sun,*
    31 USPQ2d 1451 (Fed. Cir. 1993) ...............................................................43

*Tec Air, Inc. v. Denso Mfg. Michigan, Inc.,*
    192 F.3d 1353 (Fed. Cir. 1999) ....................................................................47

*Tokai Corp. v. Easton Enters.,*
    632 F.3d 1358 (Fed. Cir. 2011) ......................................................35, 39,, 40

*In re Zurko,*
    258 F.3d 1379 (Fed. Cir. 2001) .............................................................41, 43

**Statutes and Other Authority:**

28 U.S.C. § 1295(a)(4)(A) ...........................................................................1

35 U.S.C. § 141 ...........................................................................................1

35 U.S.C. § 142 ...........................................................................................1

35 U.S.C. §103(a) ...............................................................................*passim*

MPEP 2143.01(IV) ....................................................................................46

Donald S. Chisum, CHISUM ON PATENTS, § 5.05[2][f][ii] ........................ 37-38

## I.  **STATEMENT OF RELATED CASES**

No lawsuit known to counsel is pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## II.  **JURISDICTIONAL STATEMENT**

The jurisdiction of this Court is based on 28 U.S.C. § 1295(a)(4)(A).

A Notice of Appeal was timely filed on August 5, 2013 in the United States Patent and Trademark Office, in accordance with 35 U.S.C. §§ 141 and 142.

The decision appealed from is the decision by the Board of Patent Appeals and Interferences dated June 5, 2013 in Appeal No. 2012-010402, which is a final decision with respect to a patent application and which forms the basis for this appeal.  Appendix pp. 1-14 (hereinafter "A[page number(s)]").

In its decision dated June 5, 2013, the Board fully incorporated its findings of fact and analysis from its prior decision dated August 11, 2009 in Appeal No. 2009-003447, and as such, that prior decision also forms the basis for this appeal. (A006, A012).[1]

---

[1] In its Appeal Brief filed with the Board on April 17, 2012, in Appeal No. 2012-010402, Appellants incorporated by reference the arguments that were presented in its Appeal Brief and Reply brief filed in Appeal No. 2009-003447, in order to preserve those arguments and issues for appeal to the CAFC. (A613, FN1).

## III.  STATEMENT OF ISSUES

1.     Did the Board err in rejecting claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 as being unpatentable for obviousness under 35 U.S.C. § 103(a) by failing to give due weight to all of the objective evidence of secondary considerations on the ground that Appellants had not established the requisite nexus between the evidence and the claimed invention?

2.     Did the Board err in rejecting claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 as being unpatentable for obviousness under 35 U.S.C. § 103(a) over U.S. Patent No. 6,321,984 and U.S. Patent No. 6,332,128, combined with the Official Notice supported by U.S. Patent No. 5,937,391?

## IV.  STATEMENT OF CASE

U.S. Patent Application Serial No. 10/975,277 (the "'277 Application") for System and Method of Providing Discounts on the Purchase of Gasoline was filed on October 28, 2004, by Appellants.  (A041-A087).

In a final Office Action dated June 18, 2007, the Examiner rejected claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a) as being unpatentable over either of United States Patent No. 6,321,984 for McCall et al. (the "McCall Patent") or United States Patent No. 6,332,128 to Nicholson (the "Nicholson Patent").  The rejection asserted that the claimed invention would have been obvious in view of the McCall Patent or the Nicholson Patent in

combination with common knowledge as set forth in an Official Notice supported by U.S. Patent No. 5,937,391 to Ikeda et al. (the "Ikeda Patent"). (A339, A345).

On September 18, 2007, Appellants appealed to the Board of Patent Appeals and Interferences from the decision of the Examiner dated June 18, 2007, which appeal proceeded as Appeal No. 2009-003447. (A357). Appellants' Appeal Brief was filed on December 14, 2007 (A358); the Examiner's Answer was filed on April 2, 2008 (A386); and Appellants' Reply Brief was filed May 27, 2008 (A403). On August 11, 2009, the Patent Trial and Appeal Board issued its decision in Appeal No. 2009-003447 sustaining the Examiner's rejections based on the McCall Patent and Nicholson Patent, and resolving in the affirmative the issue as to whether the claimed invention would have been obvious based on the McCall Patent or the Nicholson Patent in combination with common knowledge of skilled artisans as supported by Ikeda. (A026-027).

Following the Board's August 11, 2009, decision, Appellants requested continued examination of the pending claims by filing a Request for Continued Examination in the '277 Application, and thereafter submitted two evidentiary declarations to demonstrate the substantial commercial success and unanticipated results, and industry recognition, *inter alia*, of the invention claimed in the

subject application, namely, the Affidavit of John Lucot ("First Lucot Affidavit") and the Second Affidavit of John Lucot ("Second Lucot Affidavit") (collectively, the "Lucot Affidavits"). (A519 and A546).

In a non-final Office Action dated February 26, 2010 (A448), and a final Office Action dated October 18, 2011 (A572), the Examiner sustained the rejections over the Lucot Affidavits. The Examiner was not persuaded that the Lucot Affidavits establish a nexus between commercial success and the inventive features of the claims. (A576).

On February 17, 2012, Appellants appealed to the Board of Patent Appeals and Interferences from the decision of the Examiner dated October 18, 2011, which appeal proceeded as Appeal No. 2012-010402. (A610). Appellants' Appeal Brief was filed on April 17, 2012 (A612); the Examiner's Answer was filed on May 9, 2012 (A664); and Appellants' Reply Brief was filed July 6, 2012 (A678). On June 5, 2013, the Patent Trial and Appeal Board issued its decision in Appeal No. 2012-010402 affirming the Examiner's rejection and resolving in the negative the issue as to whether Appellants' evidence of secondary considerations, particularly commercial success, was sufficient to overcome obviousness based on a finding that Appellants failed to show a sufficient nexus between its sales figures and the claimed invention. More specifically, the Board stated that simply showing gross increases in grocery store sales is insufficient, as such sales may be

attributable to a virtually infinite array of promotional efforts.  The Board did not address any other secondary considerations evidence submitted by Appellants. (A013-A014).

Appellants timely appealed the Board's decision to the Court of Appeals for the Federal Circuit.  (A688).

## V.    STATEMENT OF FACTS

### A.    The Claimed Invention

1.    The invention as recited in independent claims 1 and 22 of the subject application relates to a system 5 and method (Figures 2, 3a, and 3b) for providing customers with an ability to purchase gasoline at a discount in an available and variable amount at the customer's election, which system may be implemented by a retailer, such as, for example, a grocery store or another high volume retailer, at a retailer location 20.   Each customer possesses customer identification information that uniquely identifies the customer to the retailer. (A041, A051; 11:6-30).   In the system 5 and method of the present invention, customers are able to use their customer identification information to both: (i) earn discounts on the future purchase of gasoline when certain discount earning actions, such as purchasing a certain dollar value of items over time, are performed at the retailer location 20, and (ii) later choose to redeem the discounts that have been earned and accumulated over time at the time that the customer

purchases gasoline at a gas station location 45.  (A041, A051, 11:6-19:20; A076-A078; Figures 2, 3a, and 3b).  The total discounts that have been accumulated over time by each customer are stored in a centralized manner in a database 30 (which is operatively coupled to a main server 25) in association with the customer identification information of each customer.   (A041, A049, 9:24-26; A052-A054, 10:25-27, 12:19-30, 13:15-20, 14:16-20; A076,  Figure 2, step 130).   After the purchase of gasoline has been initiated at the gas station location 45, each customer may gain access through the main server 25 to his or her accumulated earned discount (i.e., the total discount currently associated with the customer) stored by the database 30 and be presented with a currently available discount level at the gas station location 45.  For example, the currently available discount level may be displayed to the customer on a display which forms a part of the gasoline pump 40 after the customer has initiated the purchase of gasoline at the gas station location 45.  (A041, A056-A057, 16:12-17:24; A077, Figure 3a, steps 150-175).  In this manner, the customer is able to see what discount is available to them before deciding whether to actually take/use any discount amount.  After being presented with the currently available discount level, the customer may then either (i) elect not to take a discount at that time even though a discount is available, or (ii) elect to take a discount at that time equal to some elected discount level.  If the former election is received, no discount is provided to the customer on the purchase of

6

gasoline at that time. If the latter election is received, then the customer is provided with a discount on the purchase of gasoline equal to the elected discount level. (A041, A057-A058, 17:22-18:19; A078, Figure 3b, steps 180-205).

2.    Claim 1 recites a method of providing a customer with an ability to purchase gasoline at a discount including steps of:

a.    obtaining said customer identification information when said customer initiates the purchases of gasoline at a gasoline pump;

b.    accessing said stored accumulated discount information from said database using said customer identification information;

c.    determining an available discount level based on said accumulated discount information that is accessed;

d.    presenting said available discount level to said customer;

e.    receiving from said customer in response to said presenting step either an election not to take a discount or an election to take a discount equal to an elected discount level;

f.    providing no discount to said customer on said purchase of gasoline if said election not to take a discount is received; and

g.    providing said customer with a discount equal to said elected discount level on said purchase of gasoline if said election to take a discount equal to said elected discount level is received.

(A060).

3.    Claim 22 recites a system for providing a customer with an ability to purchase gasoline at a discount that includes:

a computing device located at a gas station location, said computing device being in electronic communication with said main server, said computing device being adapted to: (i) access said accumulated

7

discount information from said main server based on said customer identification information when said customer initiates the purchase of gasoline at said gas station location, (ii) determine an available discount level based on said accumulated discount information that is accessed, (iii) cause said available discount level to be presented to said customer, (iv) receive from said customer in response to said available discount level being presented to said customer either an election not to take a discount or an election to take a discount equal to an elected discount level, (v) provide no discount to said customer on said purchase of gasoline if said election not to take a discount is received, and (vi) provide said customer with a discount equal to said elected discount level on said purchase of gasoline if said election to take a discount equal to said elected discount level is received.

(A063-064).

4.    The remaining claims in the '277 Application depend, either directly or indirectly, from either claim 1 or 22.

**B.    The fuelperks!® Program**

5.    Giant Eagle, Inc., the parent and exclusive licensee of the assignee of the subject application and real party in interest, has since 2003 provided a fuel discount program known as **fuelperks!**® which meets the limitations of claims 1 and 22 of the subject application.  (A520-521, ¶¶7-9).

6.    The **fuelperks!**® program provides flexibility to customers in that it does not automatically apply a customer's discount, as is the case with some competing fuel reward programs, but rather provides a unique pump discount election feature as recited in claims 1 and 22 of the subject application.  (A523-524, ¶17).

7.    The pump discount election feature of the **fuelperks!**® program has been one of the major contributors to the tremendous success of the **fuelperks!**® program, as many customers elect <u>not</u> to use an available discount so that they may accumulate earned discounts and use them only once the earned discounts equal the current per gallon price of gasoline so that a free tank of gas may be obtained.  (A521-525, ¶¶12-19).

8.    The pump discount election feature of the **fuelperks!**® program provides Giant Eagle with a comparative/competitive advantage over other fuel reward programs, as millions of customers have been shown to use that feature and to make great use of that feature.  (A521-525, ¶¶12-19).

9.    During Fiscal Year 2009 alone, there were 2,576,123 unique households that received discounted fuel through the **fuelperks!**® program and $282,000,000 worth of free fuel was awarded to customers through the **fuelperks!**® program.  (A521, ¶11).

10.    Giant Eagle has seen an overall increase in gross sales of 5-6% that it attributes directly to the **fuelperks!**® program, based on sales figures from selected retail locations before and after rollout of the **fuelperks!**® program. (A521, ¶10).

11.    None of the fuel discount programs offered by Appellants' competitors utilize the key feature of the claimed invention, namely, the option for the customer, at the time of the transaction, to delay and accrue the discount or enjoy the immediate discount at the pump. (See A546-547, ¶¶2-3).

12.    The **fuelperks!®** program has earned at least two industry awards:  the Grocery Headquarters Magazine Retailer of the Year 2007 award, and the IBM Retail Leader Award for Excellence in Loyalty Marketing at the LEAD Marketing Conference in October of 2009. (A548, ¶7).

### C.    The Prosecution History

13.    Claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over either the McCall Patent or the Nicholson Patent and Official Notice as evidenced by the Ikeda Patent, and those claims are the subject of this appeal.  (A030, A026-027).

14.    Claims 5-6, 13, 17, 18, 19, 26-28, and 33 have been withdrawn from consideration as being directed to a non-elected invention. (A030, A613).

15.    Claims 37-71 have been canceled.  (A030, A613).

### D.    The Cited References

16.    The McCall Patent discloses a system for allowing a retailer to provide discounts on the purchase of fuel based on the achievement by customers of certain predefined purchasing criteria.    (A713, 1:13-17).    The preferred

embodiment of the system includes a point-of-sale (POS) terminal 200 that is located at a retail store location. The system also includes a server 204 that is coupled to the POS terminal 200. A database 206 is linked to the server 204 and includes multiple customer records 208. Each record 208 in the database 206 relates to the purchasing activities of a particular customer and may, if appropriate, include information relating to fuel discounts that were earned by the customer on a number of different dates. (A717, 10:41-49; A710-711, Figures 8, 9).

17. In operation, when a customer purchases items at the retail location, data relating to the purchased items is entered at the POS terminal 200, such as by reading a bar coded UPC symbol provided on the items. In addition, information that identifies the customer is also entered at the POS terminal 200, such as by using a member club card, personal identification number (PIN), or the like. The data relating to the purchased items and the information that identifies the customer are then provided to the server 204 by the POS terminal 200. The server 204 then determines whether the current purchases are sufficient to cause a fuel discount to be offered. (A717, 10:53-54). This step may include determining if the customer has purchased certain designated items that will trigger a discount, whether a total dollar value spent exceeds a predefined threshold and/or if a total quantity of items exceeds a threshold. (A717, 10:54-59; A710, Figure 8).

18.    In the McCall Patent, if it is determined that the customer has not yet earned a fuel discount, then no further action is taken.  (A717, 10:60-62).  However, if it is determined that a fuel discount is available, then the server 204 enters information into the customer's database record 208.  The server 204 then sends a signal to the POS terminal 200 which, in effect, reflects that the discount was earned and causes the POS terminal 200 to provide to the customer a mechanism for redeeming that particular discount (i.e., the one that was earned that day based on the particular purchases made) at the time of purchasing fuel.  (A717, 10:62-67; A710, Figure 8).

19.    The McCall Patent states that the mechanism that is provided to the customer may be a receipt having a bar code printed thereon that includes an authorization code for the particular discount, a card having a magnetic stripe thereon wherein an authorization code for the particular discount is magnetically encoded on the stripe, or an alphanumeric authorization code for the particular discount provided to the customer that is to be keyed into the pump by the customer.  When the customer wishes to redeem an earned discount when purchasing fuel, the customer must utilize a particular discount mechanism associated with a particular earned discount.  Specifically, the customer must input a particular discount authorization code by scanning in a bar code from a receipt, swiping a magnetic card, or keying in the alphanumeric authorization code at the

pump.  After the authorization code is entered, it is compared to an authorization code stored at the pump.  If a match exists, the price of the fuel is then, without any further interaction with the customer, automatically adjusted in accordance with the particular discount.  In other words, after the purchase of fuel is initiated, the discount is automatically applied and the customer is not given a chance to see what discount is available before making a decision as to whether to actually take a discount.  (A718, 11:3-13).

20.    The Nicholson Patent discloses a system for providing discounts on the purchase of gasoline based on the purchase of one or more cross-marketed products from a high volume retailer (HVR).  (A728, 1:12-17).  The system includes an HVR POS terminal 11, a gas station 12, a controller 13 that is associated with an HVR discounts issued database 14, an HVR discounts redeemed database 15, and a residual value database 16.  When a customer purchases items from the HVR, the HVR POS terminal 11 determines which purchases qualify for a price-per-unit (PPU) discount on gasoline.  (A730, 5:21-24).  A total PPU discount for that particular purchase is then calculated by adding each individual PPU discount for which the customer has qualified. (A730, 5:24-26).  The HVR POS terminal 11 then sends a discount issued message 22 to the controller 13.  (A730, 5:26-28).   When received, the information in the discount issued message 22 is stored in the HVR discounts issued database 14.  (A730, 5:37-39; A723, Figure 1).

21.    In the main embodiment of the Nicholson Patent, the HVR POS terminal 11 then prints a receipt for the customer that includes an encoded customer identification and the transaction identification associated with the just issued discount.  The transaction identification is encoded in a bar code provided on the receipt.  (A730, 5:26-35).

22.    According to the Nicholson Patent, the transaction identification for the particular discount may, alternatively, be provided to the customer in other ways (other than on a receipt), including by being transferred to an RFID device, by being magnetically encoded onto a card having a magnetic stripe, or by simply being provided to the customer in the form of an alphanumeric code.  (A729, 4:55-60).

23.    With respect to the Nicholson Patent, when the customer wants to redeem a particular discount that was earned, the customer takes the receipt to the gas station 12 and scans it using a bar code scanner provided at the pump.  This causes the pump to send a message to the controller 13 that includes the data scanned from the customer's receipt.  (A730, 6:14-18).  The controller 13 validates the request to redeem a particular discount by comparing the scanned data to data that is retrieved from the HVR discounts issued database 14.  If a match is found, the controller 13 then determines an adjusted PPU price by subtracting the PPU discount taken from the matched record from the normal price of the gasoline.  The

14

controller 13 then automatically, and without any further interaction with the customer, adjusts the price at the gasoline pump so that the customer may pump gasoline at the discounted price. In other words, after the purchase of gasoline is initiated and the data is retrieved from the HVR discounts issued database 14, the discount is automatically applied and the customer is not given a chance to see what discount is available before making a decision as to whether to actually take a discount. (A730, 6:14-18, 6:29-31; A722, Figure 1).

24. The Ikeda Patent describes a point-service system in an online shopping mall established through a network such as the Internet that includes a points issuing unit 1 that issues points based on the purchase amount of a customer, a points management device 2 that stores, for each shop in the online shopping mall that issues points, the number of points accumulated by each customer, and a points redeeming unit that reduces the purchase amount of a customer based on the number of accumulated and redeemed points. (A755, 1:7-10; A736, Figure 1). In the online shopping mall, a purchasing operation is performed by clicking on selected goods with a mouse, after which the customer makes payment and the goods are sent directly from the shop to the customer. (A756, 3:45-4:14). In addition, a customer can access the online shopping mall to check his or her current number of points, and the current number of points can be periodically transmitted by email to the customer. (A756, 4:34-38).

15

25.    The Ikeda Patent shows the flow of the process when a customer accesses an online shopping mall and purchases goods.    First, the customer sends over the network to the mall server (which implements the online shopping mall) a request to connect to the online shopping mall. In response, the mall server transmits an HTML file back to the customer which causes a screen of shop related data (i.e., the home page) to be shown on the customer's computer.  In particular, that screen (the home page) includes each shop that is included in the online shopping mall and the number of points issued by each shop to the customer.    If the customer wants to purchase a particular item, the customer selects a shop from the screen, and in response, the mall server will transmit to the customer's computer (via an HTML file) a shopping input screen for the selected shop.  If the customer clicks the "SHOPPING" button in the shopping input screen when a particular product is checked, an order screen is then transmitted  by the mall server to the customer's computer (via an HTML file).    Thus, the "SHOPPING" button provided as part of the shopping input screen is how the customer initiates the purchases of a particular item (i.e., the checked item). (A757, 5:54-6:17, 6:51-54;  A740-741, Figures 5-6; A746-748, Figures 11, 13).

26.    In the Ikeda Patent, the customer is able to specify a quantity to be purchased,  input a destination for the goods, and input a payment method.  In addition, the  customer  is  able  to  specify  whether  he  or  she  wants  to  (i)  just

accumulate points earned for the purchase (i.e., not redeem any points at that time), (ii) redeem all accumulated points in connection with that purchase, or (iii) redeem only a portion of the accumulated points in connection with that purchase (the actual number may be specified). In situations (ii) and (iii), the redeemed points are used to reduce the purchase amount. Furthermore, the customer is able to (iv) donate points to, for example, a charitable organization. (A757, 5:54-6:17; A759, 9:3-62; A741, Figure 6; A746, Figure 11; A748-749, Figures 13, and 14).

27.    In the Ikeda Patent, the order screen, which is provided to the customer after he or she initiates a purchase of an item by clicking the "SHOPPING" button of the shopping input screen, does not include the customer's total accumulated points for that shop. The only time the total accumulated points is shown to the customer is on the home page before the purchase of a particular item is initiated. Thus, unless the customer is able to remember the total points from the home page that was sent before the customer decided to purchase a particular item, the customer will need to return to the home page to access that information. (A755, 2:51-59; A741, Figure 6; A746, Figure 11; A748, Figure 13).

28.    Neither the McCall Patent, the Nicholson Patent, nor the Ikeda Patent disclose a system or method for providing a customer with the ability to purchase gasoline at a discount that, after the purchase of gasoline has been initiated by the customer, includes steps of:

17

a. "determining an available discount level based on said accumulated discount information that is accessed";

b. "presenting said available discount level to said customer";

c. "receiving from said customer in response to said presenting step either an election not to take a discount or an election to take a discount equal to an elected discount level";

d. "providing no discount to said customer on said purchase of gasoline if said election not to take a discount is received"; or

e. "providing said customer with a discount equal to said elected discount level on said purchase of gasoline if said election to take a discount equal to said elected discount level is received",

as recited in claim l and 22 of the claimed invention. (A586, A618).

## E.     The Decisions by the Patent Trial and Appeal Board

29.     The Board's August 11, 2009, decision sustained the Examiner's rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 as being unpatentable over the McCall Patent or the Nicholson Patent, finding that Appellants did not meet their burden of showing the Examiner erred in determining that a person with ordinary skill in the art would have found it obvious to modify the McCall Patent or the Nicholson Patent and combine their teachings with the Official Notice as represented by the Ikeda Patent. (A026-027, Addendum A).

30.     The Board's June 5, 2013, decision adopted the Examiner's findings of facts and analysis in rejection of the claims, finding that Appellants' evidence of commercial success was insufficient to overcome the determination of

obviousness based on a finding that Appellants failed to show a sufficient nexus between the sales figures and the claimed invention.  More specifically, the Board stated that simply showing gross increases in grocery store sales is insufficient, as such sales may be attributable to a virtually infinite array of promotional efforts. The Board did not discuss or even mention the other evidence of secondary considerations made of record and not subject to dispute, namely, evidence that the claimed invention achieved unanticipated results, met an unsolved need, and garnered industry recognition.  (A013-014, Addendum B).

## VI.    SUMMARY OF ARGUMENT

The Patent Trial and Appeal Board's decision was reversible error because the Board gave insufficient weight to the entirety of Appellants' secondary considerations evidence and failed to recognize that the requisite nexus was established between said evidence and the claimed invention.  The Board further erred in taking Official Notice as evidenced by the Ikeda Patent to attempt to fill in the gaps between the claimed invention and the McCall Patent or the Nicholson Patent because the facts asserted to be of common knowledge are not so notorious so as to be capable of instant and unquestionable demonstration as being well-known.  Finally, the Board erred in finding the claimed invention obvious in light of the cited references that do not teach the invention nor render it obvious, as demonstrated by the secondary considerations evidence.

## VII.  <u>ARGUMENT</u>

### A.    Standard of Review

The determination of whether an invention would have been obvious under 35 U.S.C. § 103(a) is a legal conclusion based on underlying findings of fact.  *In re Sullivan,* 498 F.3d 1345, 1350 (Fed. Cir. 2007).

The Board's legal conclusions of obviousness are reviewed *de novo.*  *In re Glatt Air Techniques,* 630 F.3d 1026, 1029 (Fed. Cir. 2011) *citing In re Kotzab,* 217 F.3d 1365, 1369 (Fed. Cir. 2000).

The Board's findings of fact are reviewed under the substantial evidence standard.  *Id.*  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *In re Zurko,* 258 F.3d 1379, 1384 (Fed. Cir. 2001) *quoting Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).  "In reviewing the record for substantial evidence, this court takes into account evidence that both justifies and detracts from the factual determinations."  *In re Glatt Air Techniques,* 630 F.3d at 1029.  The Supreme Court has "stressed the importance of not simply rubber-stamping agency fact-finding."  *Dickinson v. Zurko,* 527 U.S. 150, 162-163 (1999).

**B.     The   Board   Erred   by   Rejecting   Appellants'   Secondary Considerations Evidence.**

The Board rejected Appellants' objective evidence of non-obviousness based on its determination that Appellants failed to establish the requisite nexus between sales figures and the invention as claimed and disclosed.  Specifically, the Board stated that "simply showing gross increases in grocery store sales is insufficient, as such sales may be attributable to a virtually infinite array of promotional efforts."  (A013).  In this regard, the Board's findings are not supported by substantial evidence, and in fact, are contradicted by the evidence of record.

As discussed in detail below, the substantial evidence of record demonstrates that the **fuelperks!®** program that embodies the claimed invention is a popular and commercially successful discount program, in terms of increased sales and market share, and has garnered positive industry recognition.  Just as notably, the claimed invention presented an unexpected result that contributed to the commercial success and fulfilled an unsolved need by providing customers with the ability to personalize their discount program to suit their particular needs.  Because of its error in failing to recognize the nexus demonstrated by the evidence of record, the Board failed to accord due weight to Appellants' secondary considerations evidence.

1.    Secondary Considerations are Afforded Substantial Weight.

"In the obviousness analysis, secondary considerations are often some of the best 'independent evidence of nonobviousness.'" *Rolls-Royce, PLC v. United Techs. Corp.,* 603 F.3d 1325, 1339 (Fed. Cir. 2010) *citing Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,* 520 F.3d 1358, 1365 (Fed. Cir. 2008). Evidence of secondary considerations such as commercial success, meeting long-felt but unsolved needs, succeeding where others have failed, and producing unexpected results might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented and may have relevancy as indicia of obviousness. *In re Glatt Air Techniques*, 630 F.3d at FN 1 *citing Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006).

Evidence of secondary considerations "may often be the most probative and cogent evidence in the record.  It may often establish that an invention appearing to have been obvious in light of the prior art was not.  It is to be considered as part of all the evidence, not just when the decision maker remains in doubt after reviewing the art." *Spectralytics, Inc. v. Cordis Corp.,* 649 F.3d 1336, 1338-39 (Fed. Cir. 2011) *quoting Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).

Secondary considerations evidence is "not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).

The reason that secondary considerations are given such weight is "that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.,* 851 F.2d 1387, 1391 (Fed. Cir. 1988). "Thus, objective evidence of nonobviousness can be used to rebut a prima facie case of obviousness." *In re Glatt Air Techniques*, 630 F.3d at FN 1; *see also Demaco Corp.*, 851 F.2d at 1391; *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 716 F.2d 281, 306 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1017, 106 S. Ct. 1201, 89 L.Ed.2d 315 (1986).

When it is asserted that secondary considerations evidence supports a finding of non-obviousness, "there must of course be a sufficient relationship between the [secondary considerations evidence] and the ... invention. The term 'nexus' is often used, in this context, to designate a legally and factually sufficient connection between the [secondary considerations evidence] and the ... invention, such that the objective evidence should be considered in the determination of nonobviousness." *Demaco Corp.*, 851 F.2d at 1392. In *ex parte* proceedings, such

a nexus is generally established when an applicant demonstrates that the secondary considerations evidence is directly related and attributable to the merits of the claimed invention as opposed to the prior art or other extrinsic factors. *In re Huai-Hung Kao,* 639 F.3d 1057, 1070 (Fed. Cir. 2011); *In re Remark,* 15 USPQ2d 1498 (Bd. Pat. App. & Inter. 1990) ("substantial weight" should be given to secondary considerations evidence when it is established that there is a nexus between the evidence and the merits of the claimed invention).

> 2.    The Board Failed to Give Proper Weight to Appellants' Substantial and Relevant Secondary Considerations Evidence.

The Board adopted the Examiner's findings of fact and analysis to support its legal conclusion that Appellants' secondary consideration evidence was insufficient to show non-obviousness. (A012).    The Board stated in a cursory, conclusory manner that  Appellants' evidence of gross increases in grocery store sales might be attributable to a "virtually infinite array" of promotional efforts, and therefore, did not establish a sufficient nexus with the claimed invention.  (A012).

The Board's legal conclusions are not supported by substantial evidence, as those conclusions are based on speculation and fail to give due consideration to the totality of Appellants' evidence of secondary considerations.  *In re Glatt Air Techniques*, 630 F.3d at 1028 (listing various types of secondary considerations evidence); *Ortho-McNeil Pharm., Inc.*, 520 F.3d at 1365 (secondary considerations evidence in the form of unexpected results, skepticism of experts and copying, as

well as commercial success, all together constituted independent evidence of non-obviousness).

Here, the **fuelperks!®** program embodying the claimed invention had unexpected results, fulfilled an unsolved need, and received industry acclaim from the inventors' peers, and not least, achieved commercial success that is measureable not simply by a general increase in gross store sales and market share, but rather is demonstrated to be directly attributable to the unique features of the claimed invention. This secondary considerations evidence constitutes independent probative evidence of non-obviousness.

a.    Commercial Success

Appellants' secondary considerations evidence included proof of the commercial success of the **fuelperks®** program. Commercial success, on its own, may constitute sufficient evidence to establish the requisite nexus between the merits of the claimed invention and the evidence of secondary considerations. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1374 (Fed. Cir. 2010) (plaintiff established the requisite nexus by showing that the licensing fee for a covered product was more than cut in half immediately upon the expiration of the patent, which supported plaintiff's contention that the success of the device was related to the patent).

Giant Eagle, Inc., the parent and exclusive licensee of the assignee of the present invention, provides a fuel discount program known as **fuelperks!®** which meets the limitations of claims 1 and 22 of the present application. (A520, ¶¶6-9). The Giant Eagle **fuelperks!®** program is extremely popular with its customers, as evidenced by the fact that that during Fiscal year 2009, 2,576,123 unique households received discounted fuel through the **fuelperks!®** program and $282,000,000 worth of free fuel was awarded to customers through the **fuelperks!®** program. (A521, ¶11).

The Examiner had argued that because the **fuelperks!®** program gave away free fuel, Giant Eagle did not gain anything and so this does not amount to commercial success. (A578, A673). The argument is unreasonable in the context of evidence that demonstrates the success of the program measured by an increase in store traffic and market share. The argument is also based on a simple mistake of fact, as some fuel was "free" based on points earned by the customer through grocery purchases, and some fuel was purchased at a discount based on points earned by the customer through grocery purchases. What is significant is not the precise profit margin on the immediate fuel sales, but the impact of the program on overall fuel and convoyed sales at the pump and in the stores. *Ex parte Anderson*, 21 USPQ2d 1241, 1258 (Bd. Pat. App. & Inter. 1991) (commercial success not shown by merely specifying sales figures, but

also through growth in market share, replacement of earlier products sold by others, etc.).  Here, there is substantial evidence that the **fuelperks!®** program was popular and widely used.  (A521-523, ¶¶10-17, 19; A546-547, ¶¶4-7).  But more importantly, the program was highly successful in driving traffic to Giant Eagle's stores, which in turn increased grocery sales in Giant Eagle stores and growth in market share.  (A521, ¶10).    This is the sufficient measure of commercial success.

As recited in claims 1 and 22, the **fuelperks!®** program has an election option at the pump wherein the customer may, after being presented with the current available discount, elect whether to use that discount in the current fuel purchase transaction, or instead save the discount for additional  accumulation and later use.  This election option has proven to be very popular with and important to Giant Eagle's customers as demonstrated by the fact that in a single year, 25% of fuel transactions where a customer used their Giant Eagle Advantage Card at the pump ultimately resulted in the customer deciding not to redeem their available discount.  (A521-522, ¶12).  This option accordingly has been a key factor in making the **fuelperks!®** program such as success as demonstrated by the sheer volume of customers earning and redeeming a free tank of gas, which in a single year was nearly three-quarters of a million persons.  (A522, ¶14).

The commercial success of the program is further demonstrated by the competitive advantage it provides. The at pump election feature of the **fuelperks!®** program accords Giant Eagle a tremendous comparative and competitive advantage over other fuel reward programs that do not offer such a feature, since many customers clearly prefer to use this feature, and in fact, do make considerable and repeated use of the program and this feature. (A521-522, ¶¶12, 14).

Consumers in the markets which Giant Eagle, Inc. serves (western Pennsylvania, Ohio, north central West Virginia, and Maryland) have many choices as to where to do their supermarket shopping, and Giant Eagle has at least thirteen significant direct competitors in those markets, including Aldi, Costco, Kroger, Trader Joe's, Walmart, and Whole Foods. (A546-547, ¶2). Of those significant direct competitors, five offer fuel discount programs where discounts are earned based on grocery and other sales in the supermarket. (A547, ¶3). In the markets relevant to Giant Eagle's supermarket retail business, consumers are not tied to any particular supermarket retailer and/or fuel discount program, but are free to choose among many options for their supermarket shopping, including several options that offer fuel discount programs that compete with Giant Eagle's **fuelperks!®** program. Consumers in these markets may make their supermarket shopping choices based on any of a number of

objective and subjective factors each may deem important, such as price, selection, hours of operation, location, and/or the features of the various discount programs.

In this competitive environment, Giant Eagle's internal analysis demonstrates that the **fuelperks!®** program has lead directly to an overall 5% to 6% increase in gross sales for its retail locations based on sales figures from various retail locations before and after rollout of the program.  (A547, ¶4, A521, ¶10).   Giant Eagle's relative market share in the retail supermarket business in its markets has grown steadily since 2005, commencing directly after the **fuelperks!®** program was initially launched in limited stores in late 2003, and was then made available in all Giant Eagle retail locations.  (A547-548, ¶5;  A520-521 ¶¶7, 11). This growth in market share demonstrates that consumers are increasingly choosing Giant Eagle over other direct competitors, including some that offer competing fuel discount programs.

> b.    Unexpected Results and Fulfilling An Unsolved Need

Appellants' secondary considerations evidence also included evidence that the unique features of the **fuelperks®** program had unexpected results and fulfilled an unsolved need that the prior art did not recognize.  *Ortho-McNeil Pharm., Inc.*, 520 F.3d at 1360 (the record showed powerful unexpected results of the invention, which contributed to the independent evidence of non-

obviousness); *In re Glatt Air Techniques, Inc.,* 630 F.3d at 1028 (secondary considerations evidence of record included evidence of unexpected results and resolution of a long-felt need).

The at pump discount election feature of the **fuelperks!®** program gives Giant Eagle's customers the flexibility to choose when to use their earned **fuelperks!®** discounts based on how much fuel they currently need.  Giant Eagle has learned that many customers are frequently using the election option to elect <u>not</u> to use discounts in order to accumulate enough points to save them for a situation where they need more fuel, often when their vehicle with the largest fuel tank is nearly empty, to maximize the amount of fuel they can purchase at discount.  (A521-523, ¶¶12, 16-17).

To explain, in the **fuelperks!®** program, customers need to spend $250 in order to earn a 50 cents per gallon **fuelperks!®** discount.  The data that Giant Eagle has gathered shows that there are significantly more transactions where customers redeem 50 cents per gallon or more in **fuelperks!®** discounts when purchasing gasoline as compared to the number of transactions where customers purchase non-fuel products totaling $250 or more.  From September 1, 2008 to August 31, 2009, there were 1,909,931 non-fuel purchase transactions totaling $250 or more, compared to 10,083,941 fuel transactions where a customer redeemed 50 cents per gallon or more in fuelperks!® discounts.  (A523, ¶16).

This evidences that customers are not redeeming discounts immediately after they are earned.

Moreover, on average, customers fill their vehicles with more fuel (a greater number of gallons) during transactions in which they are redeeming earned **fuelperks!®** discounts as compared to transactions in which they purchase fuel without redeeming earned **fuelperks!®** discounts.  In one three-month period, from January 2009 to March 2009, the average number of gallons pumped in transactions where **fuelperks!®** discounts were redeemed was 15.97 gallons, and the average number of gallons pumped in transactions where **fuelperks!®** discounts were not redeemed was 10.08 gallons.  (A523-524 , ¶17).

The popularity of this election option has been confirmed by Giant Eagle through focus groups where customers have specifically stated that they like having the ability during a particular fuel purchasing transaction to choose to either use (redeem) their accumulated **fuelperks!®** discount or instead not redeem and continue to save their accumulated **fuelperks!®** discount so that additional discount amounts can be earned toward a free tank of gas.  An exemplary statement is "The fuelperks! program is great because you can accumulate your discounts to get a free tank of gas!"  (A522, A527-528 ¶13, Exhibit A).

The evidence of record shows that customers prefer to and are in fact choosing to accumulate their **fuelperks!®** discounts to earn a heavily discounted or free tank of gas, and to strategize so that the discount can be enjoyed with the largest possible fuel purchase. Such a result was not fully anticipated during the inventive process, and the popularity of this unique feature of the program embodying the claimed invention is further evidence of non-obviousness.

c.    Industry Recognition

Appellants' secondary considerations evidence also included proof of the recognition garnered by the program embodying the claimed invention. *Pfizer Inc. v. Teva Pharms. U.S.A., Inc.,* 882 F. Supp. 2d 643, 672 (D. Del. 2012) ("A court assessing secondary considerations in an obviousness analysis may consider evidence of substantial industry recognition where it is presented to rebut the defendants prima facie case of obviousness.") *citing Ortho McNeil Pharm., Inc.* 520 F.3d at 1365.

The **fuelperks!®** program has been recognized by the relevant industry as an innovative program, and has earned industry awards. In an article announcing Giant Eagle as the winner of its Retailer of the Year 2007 award, Grocery Headquarters Magazine stated the following about Giant Eagle's AdvantageCard® loyalty program: "With 3.5 million cardholders, the program can certainly be called a success. But what has taken it to a higher level is adding a gasoline

marketing component called Giant Eagle fuelperks! that debuted about four years ago." (A548, ¶7).

In addition, based on the **fuelperks!®** program, Giant Eagle received the IBM Retail Leader Award for Excellence in Loyalty Marketing at the LEAD Marketing Conference in October of 2009. (A548, ¶7).    This industry recognition is yet more objective evidence showing the non-obviousness of the claimed invention.

> 3.    Appellants Demonstrated a Clear and Unambiguous Nexus Between the Secondary Considerations Evidence and the Unique Features of the Claimed Invention.

A *prima facie* case of nexus is established in *ex parte* proceedings when it has been demonstrated that the secondary considerations evidence, including but not limited to commercial success, is related and attributed to the unique features of the claimed invention as opposed to other causes, such a large advertising campaign or promotions. *In re Mageli,* 470 F.2d 1380 (CCPA 1973); *In re Huai-Hung Kao,* 639 F.3d 1057, 1070 (Fed. Cir. 2011); *In re Remark,* 15 USPQ2d 1498 (Bd. Pat. App. & Inter. 1990) (it "is still necessary to show in ex parte proceedings before the [PTAB] that the commercial success was due to the merits of the claimed invention (i.e., that the claimed features were responsible for the success) if the evidence of nonobviousness is to be accorded substantial weight.").

Here, Appellants have met the burden to establish the *prima facie* case.

a.    The **fuelperks!®** Program Has Enjoyed Commercial Success, Had an Unexpected Result, Fulfilled an Unsolved Need, and Garnered Industry Recognition.

As discussed above, substantial evidence of record demonstrates that the **fuelperks!®** program has been and continues to be a tremendous commercial success, a popular and widely used discount program, that has directly lead to increased customer visits to Giant Eagle retail locations and to increased sales and market share.  The facts at issue in this case are distinguishable from those, for instance, in *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984 (Fed. Cir. 2009).  In that case, this court affirmed the finding that the indications of commercial success were <u>minimal</u> and failed to outweigh the clear indication of obviousness apparent from the prior art.  *Id.* at 994 (emphasis added).

In contrast, here, there is ample evidence of commercial success of the **fuelperks!®** program, in addition to the other strong secondary considerations evidence of record that is uncontested.  The Board erred by failing to give this objective evidence of non-obviousness the requisite consideration and weight it should be afforded.  *Rambus, Inc. v. Rea,* 2013 U.S. App. LEXIS 19500 (Fed. Cir. Sept. 24, 2013) (Rambus presented uncontested evidence of long-felt need and industry praise, and the Board erred by not addressing this evidence); *Leo*

*Pharmaceutical Products Ltd. v. Rea,* 726 F.3d 1346, 1357 (Fed. Cir. Aug. 12, 2013) ("Contrary to the Board's conclusion, this court finds the objective indicia, in concert with the entire obviousness analysis, present a compelling case of nonobviousness.").

> b. The Secondary Considerations Evidence is Directly Related and Attributable to the Unique Features of the Claimed Invention.

The secondary considerations evidence presented by Appellants shows that the program embodying claims 1 and 22 of the invention resulted from the merits of the claimed invention as opposed to the prior art or other extrinsic factors. *In re Mageli,* 470 F.2d 1380 (CCPA 1973) (nexus can be established if sales resulted from the advantageous attributes of the claimed invention rather than a large advertising campaign); *In re Huai-Hung Kao,* 639 F.3d 1057, 1070 (Fed. Cir. 2011) (nexus can be established if commercial success was caused by the merits of the invention as distinct from the prior art); *Tokai Corp. v. EastonEnters., Inc.,* 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists.").

The contents of the Lucot Affidavits (A519-528, A546-549)  made of record in this case demonstrate that the commercial success of the **fuelperks!®** program, as well as the facts that the program met an unsolved need, had unexpected results, and enjoyed significant industry recognition, were all a direct result of the unique

characteristics of the claimed invention. *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1027 (Fed. Cir. 2011) (affidavits may establish a nexus and should include a comparison of the claimed invention against the cited reference). There is a meaningful correlation between the unique features of the claimed invention and the secondary considerations evidence.

Customers have been, and are in ways that have been demonstrated, drawn to use the **fuelperks!®** program because it offers something new and unique that was not available through the programs embodying any of the cited references, namely, a method which provides the customer the ability to purchase gasoline at a discount that, after the purchase of gasoline has been initiated by the customer, includes steps of: determining an available discount level based on said accumulated discount information that is accessed; presenting said available discount level to said customer; receiving from said customer in response to said presenting step either an election not to take a discount or an election to take a discount equal to an elected discount level; providing no discount to said customer on said purchase of gasoline if said election not to take a discount is received; and providing said customer with a discount equal to said elected discount level on said purchase of gasoline if said election to take a discount equal to said elected discount level is received. Notably, in a single year period, 25% of fuel transactions where a customer scanned their Giant Eagle Advantage Card® at the

pump ultimately resulted in the customer deciding not to redeem their available discount at that time.  (A521-522, ¶12).

The Lucot Affidavits establish the significance of the advantages of the claimed invention over the cited references.  Focus groups, and actual sales and store traffic reports, demonstrate that the  option to postpone redemption of the available discount and continue to accumulate the discount in order to earn a free tank of gas for one vehicle or another is a commercially significant and very popular and attractive feature of the **fuelperks!®** program for the relevant public.  (A522, ¶13).  This option makes claims 1 and 22 of the claimed invention, as embodied in the **fuelperks!®** program, a unique feature not taught by the cited references.  It cannot be said that Appellants' commercial success was due to any element in the prior art, as the unique and popular features of the claimed invention are not taught by the prior art.

The **fuelperks!®** program also provides Appellants with a comparative and competitive advantage over competitors, which further supports the nexus between the evidence and the unique features of the claimed invention.  *Spectralytics, Inc. v. Cordis Corp.,* 649 F.3d 1336, 1339 (Fed. Cir. 2011) (nexus may be established by evidence that the new machine was the reason why its product was better than then-competing products, as it was superior with capabilities not attainable by the prior system); Donald S. Chisum, CHISUM ON PATENTS, § 5.05[2][f][ii], pp. 5-

680 (legally sufficient nexus between commercial success and merits of patented invention may be shown by "evidence that the patented feature yields comparative advantages.").    As detailed above, the pump discount election feature of the **fuelperks!**® program provides a competitive advantage over other fuel reward programs, as many customers have been shown to prefer to use that feature and make great use of the feature.  (A521-525, ¶¶12-19).

Appellants have established a clear and unambiguous nexus between Appellants' secondary considerations evidence and the unique features of the claimed invention by demonstrating through substantial evidence that the success, recognition, and comparative advantage of the **fuelperks!**® program was caused by the unique merits of the claimed invention as distinct from any other factors, including the prior art.

c.    Appellants Have Met Their Burden of Showing Nexus.

In *ex parte* proceedings such as this, "the PTO must rely upon the applicant to provide hard evidence of commercial success." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *see also In re Remark,* 15 USPQ2d 1498 (Bd. Pat. App. & Inter. 1990).

Here, Appellants have provided more than sufficient material upon which the PTO could – and should – have determined that the **fuelperks!**® program practices claims 1 and 22 of the claimed invention *and* that the **fuelperks!**®

38

program was commercially successful, had unexpected results, met an unsolved need, and garnered positive industry recognition. All the secondary considerations evidence of record has been shown to be attributable to the unique merits of the claimed invention.

In its decision, the Board adopted the Examiner's findings of fact and analysis from the Answer filed May 9, 2012, in which the entire analysis focused on Appellants' evidence of sales as the measure of commercial success. (A672-676). The Board determined that Appellants had "not shown a sufficient nexus between the sales figures presented and the invention." (A013). That is clearly not the case with the record of this matter. Further, any focus on sales alone ignores not only the increase in market share resulting from the adoption of the program but also the significant other secondary considerations evidence presented by Appellants which further demonstrate the requisite nexus and constitute proof of non-obviousness of the claimed invention.

The facts at issue in this case are distinguishable from those, for instance, in *Tokai Corp. v. Easton Enters.,* 632 F.3d 1358 (Fed. Cir. 2011). In that case, this court agreed with the district court's finding that "Tokai proffered no evidence from which one could reasonably infer a nexus between its sales data and its utility lighters' automatic-locking features." *Id.* at 1370. This court noted in particular that in "discussing the marketing and sales of Tokai's utility lighters, Tokai's

corporate representative not once referred to the automatic locking feature of Tokai's lighters—i.e., the feature that purportedly distinguishes the claimed inventions from prior art utility lighters." *Id*. In contrast, here, the Lucot Affidavits (A519-528, A546-549) discuss at length the unique features of the **fuelperks!®** program that embody the claimed invention, which features clearly distinguish the claimed invention from the cited references.

### C.     The Board Failed to Establish that the Claimed Invention was Obvious.

The Board has not established that the claimed invention was obvious under the governing legal standard. *See In re Jung*, 637 F.3d 1356, 1365–66 (Fed. Cir. 2011) (explaining that while "the applicant must identify to the Board what the examiner did wrong, . . . the examiner retains the burden to show invalidity"). A claimed invention is unpatentable if the differences between it and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a); *KSR Int'l Co. v. Teleflex, Inc.,* 550 U.S. 398, 406 (2007).

In addition to review of the relevant secondary considerations evidence, this court considers three other factors to determine obviousness under § 103: the scope and content of the prior art; differences between the prior art and the claims at issue; and the level of ordinary skill in the pertinent art. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966); *Kinetic Concepts, Inc.*

*v. Smith & Nephew, Inc.,* 688 F.3d 1342, 1360 (Fed. Cir. 2012) (a court must apply all of the so-called *Graham* factors before reaching a conclusion as to obviousness).

The Board's factual findings supporting its determination that the claimed invention would have been obvious must be supported by substantial evidence. *In re Glatt Air Techniques,* 630 F.3d 1026, 1029 (Fed. Cir. 2011) *citing In re Kotzab,* 217 F.3d 1365, 1369 (Fed. Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Zurko,* 258 F.3d 1379, 1384 (Fed. Cir. 2001) *quoting Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).

> 1.    The Prior Art Does Not Teach the Unique Features of the Claimed Invention.

It is undisputed that the McCall Patent, the Nicholson Patent, and the Ikeda Patent do not teach the unique features of the claimed invention, namely, presenting to the user the accumulated discount information (discount level) and allowing the user to interact during the course of the fuel transaction and elect to redeem or not redeem at least a portion of the presented accumulated discount. (A331, A338, A344, A586).

More specifically, the prior art does not disclose a system or method for providing a customer with the ability to purchase gasoline at a discount that, after the purchase of gasoline has been initiated by the customer, includes steps of

41

"determining an available discount level based on said accumulated discount information that is accessed", "presenting said available discount level to said customer", "receiving from said customer in response to said presenting step either an election not to take a discount or an election to take a discount equal to an elected discount level", "providing no discount to said customer on said purchase of gasoline if said election not to take a discount is received", and "providing said customer with a discount equal to said elected discount level on said purchase of gasoline if said election to take a discount equal to said elected discount level is received" as recited in claim l and, in a similar manner, in claim 22.

    2.    The Board Erred by Adopting the Examiner's Official Notice of References that Purportedly Suggest an Obvious Element of the Claimed Invention.

An examiner may take notice of facts that "while not generally notorious, are capable of such instant and unquestionable demonstration as to defy dispute." *In re Ahlert,* 424 F.2d 1088, 1091 (CCPA 1970). "Typically, it is found necessary to take notice of facts which may be used to supplement or clarify the teaching of a reference disclosure, perhaps to justify or explain a particular inference to be drawn from the reference teaching. The facts so noticed serve to 'fill in the gaps' which might exist in the evidentiary showing made by the examiner to support a particular ground for rejection." *Id.* at 1092.

When taking notice, "[a]ssertions of technical facts in areas of esoteric technology must always be supported by citation to some reference work recognized as standard in the pertinent art" for the purpose of giving the applicant the opportunity to challenge the correctness of the assertion. *In re Ahlert,* 424 F.2d at 1091; *In re Sun,* 31 USPQ2d 1451 (Fed. Cir. 1993) (unpublished) (A764); *see also In re Zurko,* 258 F.3d 1379, 1385 (Fed. Cir. 2001) ("the Board must point to some concrete evidence in the record in support of these findings [of what would be basic knowledge or common sense]"). Generalized claims fail to satisfy the level of specificity that is required. *In re Beasley,* 117 Fed. App'x. 739, 744 (Fed. Cir. 2004) (unpublished) (A769) ("statements and assumptions are inadequate to support a finding of motivation, which is a factual question that cannot be resolved on 'subjective belief and unknown authority'").

Here, the Examiner took notice that it was within the common knowledge of skilled artisans at the time of the invention to offer consumers a choice of using or not using an available discount, and thereby increase customer satisfaction by providing the features of presenting information to the user and receiving an election from the user that can be for a fraction of the available discount. (A331, A338-339, A344; A026; A005). The Board affirmed the Examiner's determination, finding that it would have been obvious to one of ordinary skill in the art at the time of the present invention to modify either the McCall Patent or

Nicholson Patent to include the missing features of claims 1 and 22 based on the Official Notice evidenced by the Ikeda Patent. (A576-577; A338-339, A344; A026).

The facts asserted to be common knowledge, i.e., the method of using or not using an available discount, was not used by the Examiner or the Board merely to fill in the gaps in an unsubstantial manner. Rather, it was relied on as the critical piece of evidence asserted to bring in the critical elements of *when* the discount was presented to the customer and *when* and *how* the customer redeemed the discount, which were entirely absent from the two cited patents.

The Ikeda Patent does not, in fact, "fill in the gap" to establish obviousness. The teachings of Ikeda are distinguishable from the claimed invention in that Ikeda does not disclose accessing and providing accumulated discount information to the user *after* the purchase has been initiated. In Ikeda, the only time the total accumulated points are shown to the user is *before* the purchase has been initiated, which then requires the user to either recall the total accumulated points later, at the actual time of purchase, or purposefully navigate away from the purchase in order to review the total accumulated points. Nothing in the Ikeda Patent supports the conclusion that after a purchase has been initiated, it is common knowledge or practice to then access accumulated discount information that is stored for the user, determine a currently available discount level from the accessed information,

present that currently available discount level to the customer, and allow the customer to make an election as to whether a discount will be redeemed at that time.

The Board's decision was in error because it failed to provide justification or explanation for the statement as to what is common knowledge or practice in the art. There is no sufficient evidence of record to support the conclusion that the facts asserted to be common knowledge are capable of instant and unquestionable demonstration as being well-known or are of notorious character. The mere fact that the Ikeda Patent exists does not establish that persons skilled in the relevant art would be aware of Ikeda or look to Ikeda for guidance, nor does it prove that the invention claimed in the Ikeda Patent is being or has been practiced so as to be the subject of common knowledge to those skilled in the art of developing loyalty programs for the purchase of gasoline. More than that, there is nothing to suggest that the Ikeda Patent is recognized as standard in the pertinent art of gasoline loyalty programs, as it specifically provides that the field of invention relates to an online shopping mall. (A755, 1:5-9).

3.    The Board Failed to Establish a *Prima Facie* Case of Obviousness.

The Examiner has the initial burden of demonstrating obviousness. "To support the conclusion that the claimed invention is directed to obvious subject matter, either the references must expressly or impliedly suggest the claimed

invention or the examiner must present a convincing line of reasoning as to why the artisan would have found the claimed invention to have been obvious in light of the teachings of the references." *Ex parte Clapp,* 227 USPQ 972, 973 (Bd. Pat. App. & Inter. 1985) (unpublished) (A775).

Evidence must be presented to support the finding of obviousness, not merely speculation. *See In re Jones,* 958 F.2d 347, 351 (Fed. Cir. 1992). "A statement that modifications of the prior art to meet the claimed invention would have been 'well within the ordinary skill of the art at the time the claimed invention was made' because the references relied upon teach that all aspects of the claimed invention were individually known in the art is not sufficient to establish a *prima facie* case of obviousness without some objective reason to combine the teachings of the references." MPEP 2143.01(IV) *citing Ex parte Levengood,* 28 USPQ2d 1300 (Bd. Pat. App. & Inter. 1993) (unpublished) (A778); *In re Kotzab,* 217 F.3d 1365, 1371-72 (Fed. Cir. 2000) (without a motivation to combine the teachings, any prima facie case of obviousness necessarily fails).

"[A] particular course or selection is not obvious to try unless some design need or market pressure or other motivation would suggest to one of ordinary skill to pursue the claimed course or selection. In other words, one of ordinary skill must have 'good reason to pursue the known options within his or her technical grasp.'" *Rolls-Royce, PLC v. United Techs. Corp.,* 603 F.3d 1325, 1339 (Fed. Cir.

2010) *citing KSR,* 550 U.S. at 421.    There is "no suggestion to combine. . . if a reference teaches away from its combination with another reference." *Tec Air, Inc. v. Denso Mfg. Michigan, Inc.,* 192 F.3d 1353, 1359-60 (Fed. Cir. 1999); *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1311 (Fed. Cir. 2010) ("In light of the prior art teaching away from the claimed invention and the claimed features that do not appear in the prior art, this court detects several reasons at the time of the invention that an ordinary artisan would not have been motivated even to try, let alone make, this inventive combination.").

Here, there is no reason why one skilled in the art would have been prompted or motivated to modify a system as taught by the McCall Patent or the Nicholson Patent to: after the purchase of gasoline has been initiated by a customer, then access accumulated discount information that is stored for the customer, determine a currently available discount level from the accessed information, present that currently available discount level to the customer, and allow the customer to make an election as to whether a discount will be redeemed at that time on the presented currently available discount level.  Indeed, the McCall Patent and the Nicholson Patent teaches the exact opposite, namely, that after the purchase of fuel is initiated, the discount is automatically applied to the transaction.  (A717, 10:62-67; A730, 6:14-18, 6:29-31).

Given this, it is clear that there is nothing in the teachings of prior art that would have prompted a person of ordinary skill in the art to modify the systems of the McCall Patent or the Nicholson Patent to provide an available discount level to the customer at the specific point recited in claims 1 and 22 of the claimed invention. Any teaching, suggestion, or motivation to combine the references would have originated from the claimed invention itself. *Leo Pharmaceutical Products Ltd. v. Rea,* 726 F.3d 1346, 1354 (determining that "the Board erred by collapsing the obviousness analysis into a hindsight-guided combination of elements. This record. . .discloses several reasons that a person of ordinary skill in the art would not have been motivated to try, let alone make, the claimed invention of the '013 patent.").

Upon consideration of the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and the secondary considerations evidence, it is clear that the Board's factual findings with respect to these factors are not supported by the substantial evidence. A reasonable mind would not as a matter of course accept the evidence of record as adequate to support the Board's factual conclusions on the issue of obviousness. The rejection of claims 1 and 22 under 35 U.S.C. § 103(a) based on alleged common knowledge in the art as exemplified in the Official Notice was accordingly in error.

48

## VIII. <u>CONCLUSION AND STATEMENT OF RELIEF SOUGHT</u>

For the reasons set forth herein, claims 1 and 22 of the '277 Application are allowable over the cited references, and because claims 2-4, 7-12, 14-16, 20-21, 23-25, 29-32, and 34-36 depend, either directly or indirectly, from either claim 1 or claim 22, those claims are similarly allowable over the cited references.

The Board erred in rejecting claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a).  Accordingly, Appellants respectfully request this Court to **REVERSE** the Board's decision affirming the Examiner's rejection of the claims.

> **ECKERT SEAMANS**
>  **CHERIN & MELLOTT, LLC**
>
> /s/ Roberta Jacobs-Meadway
> Roberta Jacobs-Meadway
> Bridget Heffernan Labutta
> David V. Radack
> Philip E. Levy
> Two Liberty Place, 22nd Floor
> 50 South 16th Street
> Philadelphia, PA 19102
> Telephone: (215) 851-8400
> Facsimile: (215) 851-8383
>
> *Attorneys for Appellants*

Dated: November 18, 2013

# <u>TABLE OF CONTENTS</u>
## Addendum to Brief of Appellants

**USPTO** Decision Sustaining Examiner's Rejection of Claims
1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 as Being Unpatentable
     filed August 11, 2009 ..................................................................... Addendum A

USPTO Decision Adopting Examiner's Findings of Facts and
Analysis in Rejection of the Claims
     filed June 5, 2013 .......................................................................... Addendum B

# ADDENDUM A

 Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/975,277 | 10/28/2004 | Russell G. Ross | 076021-00604 | 6022 |

3705      7590      08/11/2009
ECKERT SEAMANS CHERIN & MELLOTT
600 GRANT STREET
44TH FLOOR
PITTSBURGH, PA 15219

| EXAMINER |
|---|
| JANVIER, JEAN D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3688 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/11/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

———————————

*Ex parte* RUSSELL G. ROSS and REBECCA B. KANE

———————————

Appeal 2009-003447
Application 10/975,277
Technology Center 3600

———————————

Decided: August 11, 2009

———————————

Before HUBERT C. LORIN, ANTON W. FETTING, and
JOSEPH A. FISCHETTI, *Administrative Patent Judges.*

FETTING, *Administrative Patent Judge.*

DECISION ON APPEAL

Appeal 2009-003497
Application 10/975,277

## STATEMENT OF THE CASE

Russell G. Ross and Rebecca B. Kane (Appellants) seek review under 35 U.S.C. § 134 (2002) of a final rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36, the only claims pending in the application on appeal.

We have jurisdiction over the appeal pursuant to 35 U.S.C. § 6(b) (2002).

## SUMMARY OF DECISION

We AFFIRM.

## THE INVENTION

The Appellants invented a system and method for providing discounts to customers who perform certain actions, such as purchasing gasoline using a customer identification number (Specification 1:7-12).

An understanding of the invention can be derived from a reading of exemplary claim 1, which is reproduced below [bracketed matter and some paragraphing added].

1. A method of providing a customer with an ability to purchase gasoline at a discount, said customer having customer identification information, the method comprising:

[1] determining accumulated discount information each time:

(i) said customer performs at least one of one or more predefined actions,

(ii) said customer identification information is received in association with said at least one of one or more predefined actions, and

2

Appeal 2009-003497
Application 10/975,277

(iii) first information relating to said at least one of one or more predefined actions is received, said accumulated discount information being based on said first information;

[2] storing in a database said accumulated discount information in association with said customer identification information;

[3] obtaining said customer identification information when said customer initiates the purchase of gasoline;

[4] accessing said stored accumulated discount information from said database using said customer identification information;

[5] determining an available discount level based on said accumulated discount information that is accessed;

[6] presenting said available discount level to said customer;

[7] receiving from said customer in response to said presenting step either an election not to take a discount or an election to take a discount equal to an elected discount level;

[8] providing no discount to said customer on said purchase of gasoline if said election not to take a discount is received; and

[9] providing said customer with a discount equal to said elected discount level on said purchase of gasoline if said election to take a discount equal to said elected discount level is received.

## THE REJECTIONS

The Examiner relies upon the following prior art:

| Ikeda et al. | US 5,937,391 | Aug. 10, 1999 |
| McCall et al. | US 6,321,984 B1 | Nov. 27, 2001 |
| Nicholson | US 6,332,128 B1 | Dec. 18, 2001 |

3

Appeal 2009-003497
Application 10/975,277

## ARGUMENTS

*Claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36* under 35 U.S.C. §
103(a) as unpatentable over McCall or Nicholson

The Appellants argue these claims as a group.

Accordingly, we select claim 1 as representative of the group. 37
C.F.R. § 41.37(c)(1)(vii) (2008).

The Examiner found that McCall describes all of the limitations of
claim 1, except for limitations [6] and [7]. Answer 3-7. The Examiner
further found that, McCall failed to describe dependant claims 4 and 9.
Answer 7. The Examiner also found that, Nicholson describes all of the
limitations of claim 1, except for limitation [7]. Answer 9-13. The
Examiner further found that, Nicholson fails to describe dependant claim 9.
Answer 13. The Examiner found that, the features recited in limitations [6]
and [7] of claim 1 as well as claims 4 and 9 were notoriously old and well-
known in the art and as such took Official Notice of these features. Answer
7-8 and 13. The Examiner found that, a person with ordinary skill in the art
would have recognized the benefit of presenting a user with options, thereby
increasing customer satisfaction. The increased satisfaction would come
from providing information to the user and receiving an election from the
user that can be for a fraction of the available discount. Answer 8 and 14.
The Examiner further found that, a person with ordinary skill in the art
would have found it obvious to modify McCall or Nicholson to include these
well known features. Answer 8 and 14.

The Appellants contend that: (1) the claims 1 and 22 require a
discount to be determined and presented to the customer after the purchase
of gasoline has been initiated by the customer, which was not common

4

Appeal 2009-003497
Application 10/975,277

knowledge in the art, and therefore the Examiner's taking of Official Notice
was improper (App. Br. 8-9 and Reply Br. 2-3), and Ikeda does not support
the Examiner's taking of Official Notice (App. Br. 10 and Reply Br. 3-4);
(2) there is no motivation to combine McCall or Nicholson with the Official
Notice, and the Examiner, improperly, used the Appellants' disclosure as a
roadmap in reconstructing the prior art.  Appeal Brief 14-16 and Reply Brief
4.

## ISSUES

The issue pertinent to this appeal is whether the Appellants have
sustained their burden of showing that the Examiner erred in rejecting claims
1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a) as
unpatentable over McCall or Nicholson.  The pertinent issue turns on
whether the Examiner's taking of Official Notice of certain facts was proper
and whether there is a motivation to modify McCall or Nicholson with the
Official Notice.

## FACTS PERTINENT TO THE ISSUES

The following enumerated Findings of Fact (FF) are believed to be
supported by a preponderance of the evidence.

*Facts Related to the Prior Art*

*McCall*

01. McCall is directed to a fuel dispenser with a promotional system
that provides promotional discounts and other marketing offerings to a
customer based on the customer's purchasing habits.  McCall 1:13-17.

5

Appeal 2009-003497
Application 10/975,277

02. The process begins with a customer purchasing items at a point of sale (POS) terminal. McCall 10:41-43. The customer identity is also entered using a member card, personal identification number (PIN) or the like (McCall 10:44-46). The data related to the purchased items is transmitted to the server and the server analyzes the received data. McCall 10:47-49.

03. The server makes a determination, based on the analysis of the received data, "whether the current purchases will cause a fuel discount to be offered." McCall 10:53-54. The determination can be based on whether the purchase of specific items that trigger a discount, or whether the total dollar value spent exceeds a predefined threshold amount, or whether the total quantity of items purchased exceeds a predefined threshold (McCall 10:54-59).

04. If the determination is that no discount will be offered, the process ends. McCall 10:60-62. If it is determined that a discount will be offered, the server authorizes the discount, sends a signal to the POS, and a discount coupon, authorization code, or other discount mechanism is provided to the customer. McCall 10:62-67.

*Nicholson*

05. Nicholson is directed to a system and method for controlling the generation, distribution, and redemption of coupons, and the allocation of discounted values to multiple vendors in cross-marketing ventures. Nicholson 1:12-17.

06. When a customer purchases items from the merchant, a point of sale (POS) terminal determines which purchases qualify for a discount on gasoline. Nicholson 5:21-24. The purchases discounts are summed to

6

Appeal 2009-003497
Application 10/975,277

determine a total discount value the customer is qualified to receive.
Nicholson 5:24-26. The identification of the customer and total discount
information are transmitted to the merchant. Nicholson 5:26-28. The POS
terminal prints a receipt for the customer that includes the customer
identification and discount information. Nicholson 5:32-35.

07. When a customer desires to redeem the discount, the printed
receipt is scanned at the gasoline pump dispenser causing the dispenser to
send a start transaction message to the controller. Nicholson 6:14-18. The
controller determines an adjusted price by subtracting the total discount from
the normal price. Nicholson 6:29-31.

*Ikeda*

08. Ikeda is directed to a point-service system for realizing a point-
service as a sales promotion service for a transaction in an online shopping
mall. Ikeda 1:7-10.

09. When a customer decides to buy goods, the number of effective
accumulated points of the customer is displayed on the customer terminal.
Ikeda 2:51-59.

10. In the order screen, a customer inputs whether to redeem all of the
accumulated points or the customer specifies the number of points to redeem
if the customer elects a partial redemption of points when submitting an
order. Ikeda 9:55-62. The order screen displays the amount of points the
customer has to select from to be able to use for the current order. Figure 13.

*Facts Related To The Level Of Skill In The Art*

11. Neither the Examiner nor the Appellants has addressed the level of
ordinary skill in the pertinent arts of discounting systems and customer
relationship management systems. We will therefore consider the cited prior

7

Appeal 2009-003497
Application 10/975,277

art as representative of the level of ordinary skill in the art. See Okajima v. Bourdeau, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("[T]he absence of specific findings on the level of skill in the art does not give rise to reversible error 'where the prior art itself reflects an appropriate level and a need for testimony is not shown'") (quoting Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158, 163 (Fed. Cir. 1985).

*Facts Related To Secondary Considerations*

12. There is no evidence on record of secondary considerations of non-obviousness for our consideration.

PRINCIPLES OF LAW

*Obviousness*

A claimed invention is unpatentable if the differences between it and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (2000); KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007); Graham v. John Deere Co., 383 U.S. 1, 13-14 (1966).

In Graham, the Court held that that the obviousness analysis is bottomed on several basic factual inquiries: "[(1)] the scope and content of the prior art are to be determined; [(2)] differences between the prior art and the claims at issue are to be ascertained; and [(3)] the level of ordinary skill in the pertinent art resolved." 383 U.S. at 17. See also KSR, 550 U.S. at 406. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." Id. at 416.

8

Appeal 2009-003497
Application 10/975,277

## ANALYSIS

Claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. §
103(a) as unpatentable over McCall or Nicholson

The Appellants contend, that (1) the claims 1 and 22 require a
discount to be determined and presented to the customer after the purchase
of gasoline has been initiated by the customer, which was not common
knowledge in the art and therefore the Examiner's taking of Official Notice
was improper (App. Br. 8-9 and Reply Br. 2-3) and furthermore Ikeda does
not support the Examiner's taking of Official Notice as per claims 1 and 22.
Appeal Brief 10 and Reply Brief 3-4.

We disagree with the Appellants. First, the scope Examiner's Official
Notice of facts that describe the features of the claimed invention shall be
determined since the Appellants are contesting whether the Examiner has
taken Official Notice of the appropriate facts. Appeal Brief 8-9. Limitation
[3] of claim 1 requires obtaining customer identification information when
the transaction to purchase gasoline is initiated. The Examiner took Official
Notice of the facts that the features of enabling a user to view accumulated
discount or point information during a transaction are old and well-known in
the art at the time of the invention. The facts taken under Official Notice
explicitly describe viewing information after a transaction has begun but has
not ended. Thus, the Examiner's Official Notice includes the fact that the
features of determining and presenting discount information to the customer
after the customer has initiated the purchase of an item as required by
limitation [3] of claim 1. As such, the Examiner Official Notice is directed
toward answer the appropriate inquiry.

Appeal 2009-003497
Application 10/975,277

Next, whether the taking of these facts under Official Notice was proper, shall be determined. The Examiner submitted Ikeda, in support of the Official Notice taken, in order to demonstrate that these facts are capable of instant and unquestionable demonstration, as being well-known in the art. Ikeda describes that, when a customer initiates an order for items, the customer fills out information on the order entry screen. FF 10. Included in the order entry screen is the amount of points available for redemption. FF 10. Ikeda further describes that the customer can elect to use all of the available points or select a number of points for partial redemption for a transaction. FF 10. As such, Ikeda describes that the facts taken under Official Notice are capable of instant and unquestionable demonstration as being old and well-known in the art. As such, the Examiner's taking of Official Notice that the features enabling a user to view accumulated discounts or points information, during a transaction was proper and described in limitation [3] of claim 1.

The Appellants further contend that (2) there is no motivation to modify McCall or Nicholson with the Official Notice and the Examiner, improperly, used the Appellants' disclosure as a roadmap in reconstructing the prior art. Appeal Brief 14-16 and Reply Brief 4. We disagree with the Appellants. McCall and Nicholson are both concerned with providing discounts and promotional items in conjunction with the purchase of gasoline. FF 01 and FF 05. Both McCall and Nicholson accomplish this goal by determining whether a discount should be offered to a customer for the purchases made by the customer and providing a method for the customer to redeem the offered discount. FF 02, FF 03, FF 06, and FF 07.

10

Appeal 2009-003497
Application 10/975,277

A person with ordinary skill in the art would have recognized the benefit of presenting a user with options and thereby increasing customer satisfaction by providing the features of presenting information to the user and receiving an election from the user that can be for a fraction of the available discount. As such, a person with ordinary skill in the art would have found it obvious to modify McCall or Nicholson with the Official Notice. Since the facts taken under Official Notice were notoriously old and well-known and McCall and Nicholson are concerned with the same problems, a person with ordinary skill in the art would have been lead to combine their teachings at the time of the claimed invention.

The Appellants have not sustained his burden of showing that the Examiner erred in rejecting claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a) as unpatentable over McCall or Nicholson.

## CONCLUSIONS OF LAW

The Appellants have not sustained their burden of showing that the Examiner erred in rejecting claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a) as unpatentable over McCall.

The Appellants have not sustained their burden of showing that the Examiner erred in rejecting claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a) as unpatentable over Nicholson.

## DECISION

To summarize, our decision is as follows.

• The rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a) as unpatentable over McCall is sustained.

11

Appeal 2009-003497
Application 10/975,277


• The rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under 35 U.S.C. § 103(a) as unpatentable over Nicholson is sustained.


No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).


AFFIRMED


mev




ECKERT SEAMANS CHERIN & MELLOTT
600 GRANT STREET
44TH FLOOR
PITTSBURGH, PA 15219

# ADDENDUM B



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/975,277 | 10/28/2004 | Russell G. Ross | 076021-00604 | 6022 |

3705        7590        06/05/2013
ECKERT SEAMANS CHERIN & MELLOTT
600 GRANT STREET
44TH FLOOR
PITTSBURGH, PA 15219

| EXAMINER |
|---|
| SIGMOND, BENNETT M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3688 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/05/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

1    UNITED STATES PATENT AND TRADEMARK OFFICE
2    _____
3
4    BEFORE THE PATENT TRIAL AND APPEAL BOARD
5    _____
6
7    *Ex parte* RUSSELL G. ROSS
8    and
9    REBECCA B. KANE
10   _____
11
12   Appeal 2012-010402
13   Application 10/975,277
14   Technology Center 3600
15   _____
16
17
18   Before HUBERT C. LORIN, ANTON W. FETTING, and
19   JOSEPH A. FISCHETTI, *Administrative Patent Judges.*
20   FETTING, *Administrative Patent Judge.*

21            DECISION ON APPEAL

Appeal 2012-010402
Application 10/975,277

1              STATEMENT OF THE CASE[1]

2      Russell G. Ross and Rebecca B. Kane (Appellants) seek review under

3   35 U.S.C. § 134 of a final rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32,

4   and 34-36, the only claims pending in the application on appeal.  We have

5   jurisdiction over the appeal pursuant to 35 U.S.C. § 6(b).

6      The Appellants invented a way of providing discounts to customers on

7   the purchase of gasoline, in which customers earn discounts when

8   performing certain actions, such as making purchases, wherein the discounts

9   are associated with customer identification information and may be

10  redeemed by the customers when purchasing gasoline using the customer

11  identification information (Specification 1:Field of the Invention).  This is

12  the second time this application is before the Board.  The rejections are over

13  substantially the same art and descriptions in the art.

14     An understanding of the invention can be derived from a reading of

15  exemplary claim 1, which is reproduced below [bracketed matter and some

16  paragraphing added].

17      1. A method of

18          providing a customer

19          with an ability to purchase gasoline at a discount,

20          said customer having customer identification

21          information,

22      the method comprising:

---

[1] Our decision will make reference to the Appellants' Appeal Brief ("App. Br.," filed April 17, 2012) and Reply Brief ("Reply Br.," filed July 6, 2012), and the Examiner's Answer ("Ans.," mailed May 9, 2012).

Appeal 2012-010402
Application 10/975,277

| | |
|---|---|
| 1 | [1] determining |
| 2 | in a retailer computer system |
| 3 | accumulated discount information each time: |
| 4 | (i) said customer performs at least one |
| 5 | of one or more predefined actions, |
| 6 | (ii) said customer identification information is |
| 7 | received |
| 8 | in association with said at least one of one or |
| 9 | more predefined actions, |
| 10 | and |
| 11 | (iii) first information relating to said at least one of |
| 12 | one or more predefined actions is received, |
| 13 | said accumulated discount information being |
| 14 | based on said first information; |
| 15 | [2] storing in a database |
| 16 | said accumulated discount information |
| 17 | in association with said customer identification |
| 18 | information; |
| 19 | [3] obtaining said customer identification information |
| 20 | when said customer initiates the purchase of gasoline |
| 21 | at a gasoline pump; |
| 22 | [4] accessing said stored accumulated discount information |
| 23 | from said database |
| 24 | using said customer identification information; |
| 25 | [5] determining an available discount level |
| 26 | based on said accumulated discount information that is |
| 27 | accessed; |
| 28 | [6] presenting said available discount level |
| 29 | to said customer; |

Appeal 2012-010402
Application 10/975,277

1       [7] receiving
2           from said customer
3           in response to said presenting step
4        either
5           an election not to take a discount
6           or
7           an election to take a discount
8             equal to an elected discount level;
9       [8] providing no discount
10          to said customer
11          on said purchase of gasoline
12        if said election not to take a discount is received;
13       and
14      [9] providing said customer
15        with a discount
16          equal to said elected discount level on said
17          purchase of gasoline
18          if said election to take a discount equal to said
19          elected discount level is received.

20      The Examiner relies upon the following prior art:

| Ikeda | US 5,937,391 | Aug. 10, 1999 |
| McCall | US 6,321,984 B1 | Nov. 27, 2001 |
| Nicholson | US 6,332,128 B1 | Dec. 18, 2001 |

21      Claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 stand rejected under

22  35 U.S.C. § 103(a) as unpatentable over McCall and official notice as

23  evidenced by Ikeda.

4

Appeal 2012-010402
Application 10/975,277

Claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 stand rejected under 35 U.S.C. § 103(a) as unpatentable over McCall and Nicholson and official notice as evidenced by Ikeda.

## ISSUES

The issues as to whether the contended limitations are described by the art were resolved in the affirmative in the earlier Decision mailed August 11, 2009. Thus, the issues in the current appeal turn on whether the evidence of commercial success is sufficient to show non-obviousness.

## FACTS PERTINENT TO THE ISSUES

The following enumerated Findings of Fact (FF) are believed to be supported by a preponderance of the evidence.

*Facts Related to the Prior Art*

*McCall*

01.   McCall is directed to a promotional system utilized in conjunction with a fuel dispenser that will allow promotional discounts and other marketing type offerings to be provided to a consumer based on the customer's purchasing habits. McCall 1:13-17.

02.   McCall couples a customer reward data processing system with a fuel dispensing apparatus to allow a retailer to authorize discounted fuel or other marketing promotions in accordance with a customer's achievement of predefined purchasing criteria. McCall 2:20-24.

Appeal 2012-010402
Application 10/975,277

1      03.   The reward system will track the customer purchases and
2      compare them with a predefined criteria to determine when a fuel
3      discount is to be provided. These predefined criteria may include
4      whether the customer purchased items from a group of designated
5      products (e.g. promotional items) exceeded a quantity threshold, a
6      dollar value threshold, made purchases made on specific dates, or
7      the like. McCall 2:25-36.

8      04.   When a customer meets one of the predefined criteria, the
9      reward system will authorize a fuel discount or reward and
10      provide the customer with a mechanism to obtain the discounted
11      fuel. This mechanism can include a bar coded receipt, data on a
12      magnetic stripe card, an authorization identification number
13      sequence, or the like. The reward system also notifies a controller
14      in the fuel dispensing apparatus that a discount fuel sale is
15      authorized for a specific authorization code, as well as the amount
16      of the discount, e.g. $0.10 dollars per gallon. McCall 2:37-46.

17      05.   When purchasing fuel, the customer inputs the received
18      authorization code at the pump by scanning in the bar code from
19      the receipt, swiping a magnetic card, entering a code on a key pad,
20      or the like. The pump controller then compares the customer
21      entered authorization code with the code received from the reward
22      system. The pump controller then adjusts the purchase price by
23      subtracting the discount amount and allows the fuel to be
24      dispensed at that rate for this transaction only. At this time a point
25      of sale terminal associated with the fuel dispensing apparatus may
26      also be notified of the adjusted fuel price. McCall 2:47-57.

Appeal 2012-010402
Application 10/975,277

06. Upon completion of the transaction, the controller notifies the
reward system that the discount fuel has been purchased by the
customer. The reward system then updates the record for this
customer accordingly. This information is then available to the
retailer that sets the purchasing criteria to use to develop new
marketing strategies. That is, the retailer needs to know that a
certain promotional activity is working in order to determine
whether to continue with the existing purchase criteria or change
the criteria to attract a larger number of customers. McCall 2:58-
67.

07. The process begins with a customer purchasing items at a point
of sale (POS) terminal. McCall 10:41-43. The customer identity
is also entered using a member card, personal identification
number (PIN) or the like (McCall 10:44-46). The data related to
the purchased items is transmitted to the server and the server
analyzes the received data. McCall 10:47-49.

08. The server makes a determination, based on the analysis of the
received data, "whether the current purchases will cause a fuel
discount to be offered." McCall 10:53-54. The determination can
be based on whether the purchase of specific items that trigger a
discount, or whether the total dollar value spent exceeds a
predefined threshold amount, or whether the total quantity of
items purchased exceeds a predefined threshold (McCall 10:54-
59).

Appeal 2012-010402
Application 10/975,277

1       09.   If the determination is that no discount will be offered, the

2            process ends. McCall 10:60-62. If it is determined that a discount

3            will be offered, the server authorizes the discount, sends a signal

4            to the POS, and a discount coupon, authorization code, or other

5            discount mechanism is provided to the customer. McCall 10:62-

6            67.

7    *Nicholson*

8       10.   Nicholson is directed to the generation and redemption of

9            discount coupons for multiple vendors and controlling the

10          generation, distribution, and redemption of coupons, and the

11          allocation of discounted values to multiple vendors involved in

12          cross-marketing ventures. Nicholson 1:12-17.

13      11.   Nicholson provides multiple level discounts on a first product

14          to a customer who purchases at least one cross-marketed product

15          by awarding a first discount on the first product to the customer

16          based on a purchase by the customer of a first cross-marketed

17          product, awarding a second discount on the first product to the

18          customer based on a purchase by the customer of a second cross-

19          marketed product, adding the first discount to the second discount

20          to determine a total discount on the first product, and awarding the

21          total discount to the customer. Nicholson 2:40-50.

22      12.   Nicholson alternately provides a discount on a first product to a

23          customer who purchases at least one cross-marketed product by

24          awarding a first discount on the first product to the customer

25          based on a purchase by the customer of a first cross-marketed

8

Appeal 2012-010402
Application 10/975,277

1    product, and then issuing a coupon to the customer which

2    provides a customer identification and a transaction identification.

3    A discount amount is stored in a discounts issued database which

4    associates the discount amount with the customer identification

5    and the transaction identification. This is followed by inputting,

6    by the customer in a subsequent transaction, the customer

7    identification and the transaction identification, retrieving the

8    discount amount from the discounts issued database, and reducing

9    the price of the first product by the discount amount. Nicholson

10   2:51-65.

11   13.    In yet another alternative, Nicholson provides multiple level

12   discounts on gasoline to a customer who purchases at least one

13   cross-marketed product by awarding to the customer, a first

14   discount on the price-per-unit-volume of the gasoline based on a

15   purchase by the customer of a first cross-marketed product, and

16   awarding a second discount on the price-per-unit-volume of the

17   gasoline based on the purchase of a second cross-marketed

18   product. The first discount is then added to the second discount to

19   determine a total discount on the price-per-unit-volume of the

20   gasoline. A paper receipt is printed for the customer with a

21   customer identification and a transaction identification encoded in

22   a bar code thereon. The total discount, a maximum number of

23   volume units allowed, and a minimum purchase of gasoline

24   required in order to qualify for the discount are stored in a

25   discounts issued database which associates these data with the

26   customer identification and the transaction identification. The

Appeal 2012-010402
Application 10/975,277

1    customer then scans the encoded bar code with a bar code scanner
2    at a gasoline dispenser. The total discount is retrieved from the
3    discounts issued database, and the gasoline station then reduces
4    the price-per-unit-volume of the gasoline by an amount equal to
5    the total discount. When the customer completes the gasoline
6    purchase, a value of the total discount redeemed is determined.
7    This is followed by verifying that the value of the total discount
8    redeemed is equal to or less than the maximum discount allowed,
9    and verifying that the amount of gasoline purchased is equal to or
10   greater than the minimum purchase required to qualify for the
11   discount. The value of the discount redeemed is then stored in a
12   discounts redeemed database, and portions of the discount
13   redeemed are allocated to vendors of the first and second cross-
14   marketed products according to predetermined criteria.
15   Nicholson 2:66 – 3:32.

16   14.   When a customer purchases items from the merchant, a point of
17        sale (POS) terminal determines which purchases qualify for a
18        discount on gasoline. Nicholson 5:21-24. The purchases discounts
19        are summed to determine a total discount value the customer is
20        qualified to receive. Nicholson 5:24-26. The identification of the
21        customer and total discount information are transmitted to the
22        merchant. Nicholson 5:26-28. The POS terminal prints a receipt
23        for the customer that includes the customer identification and
24        discount information. Nicholson 5:32-35.

25   15.   When a customer desires to redeem the discount, the printed
26        receipt is scanned at the gasoline pump dispenser causing the

10

Appeal 2012-010402
Application 10/975,277

1    dispenser to send a start transaction message to the controller.
2    Nicholson 6:14-18. The controller determines an adjusted price
3    by subtracting the total discount from the normal price. Nicholson
4    6:29-31.

5    *Ikeda*

6    16.    Ikeda is directed to a point-service system for realizing a point-
7        service as a sales promotion service for a transaction in an online
8        shopping mall. Ikeda 1:7-10.

9    17.    When a customer decides to buy goods, the number of effective
10        accumulated points of the customer is displayed on the customer
11        terminal. Ikeda 2:51-59.

12    18.    In the order screen, a customer inputs whether to redeem all of
13        the accumulated points or the customer specifies the number of
14        points to redeem if the customer elects a partial redemption of
15        points when submitting an order. Ikeda 9:55-62. The order screen
16        displays the amount of points the customer has to select from to be
17        able to use for the current order. Figure 13.

18                    ANALYSIS

19    We fully incorporate our findings of fact and analysis from the prior
20    Decision mailed August 11, 2009. In that Decision, the panel affirmed
21    substantially similar rejections over substantially similar claims. Subsequent
22    to that Decision, two evidence declarations were filed showing commercial
23    success and industry praise.

Appeal 2012-010402
Application 10/975,277

1    As the issues of whether the prior art described the claim limitations and

2    whether there was a reason to combine the prior art in the manner claimed

3    articulated by the Examiner with a rational basis have already been settled,

4    the issue before us presently is whether, looking at claim 1 in its entirety in

5    light of the evidence provided in the Declarations, piecing together the

6    limitations in the manner claimed were not predictable.

7    We adopt the Examiner's findings of facts and analysis from Ans. 3-12,

8    and reach similar legal conclusions that the Declaration evidence is

9    insufficient to show non-obviousness.  In particular, we find Appellants have

10   not shown a sufficient nexus between the sales figures presented and the

11   invention.  Simply showing gross increases in grocery store sales is

12   insufficient, as such sales may be attributable to a virtually infinite array of

13   promotional efforts.

14   Most fatal to finding a nexus, however, is that the evidence is not

15   relative to that of applying the practice officially noticed and evidenced by

16   Ikeda's promotional techniques to either McCall or Nicholson.  That is,

17   Appellants have not shown that the statistics and praise were unusual

18   compared to what McCall or Nicholson would have experienced using the

19   customer visibility and option generally known at the time and described by

20   Ikeda in particular.  Neither have Appellants shown there was anything

21   unusual about Ikeda as an exemplar of this practice that would not have

22   commended its simple promotional scheme of providing visibility of

23   accumulated points to customers and allowing them the option to use them.

12

Appeal 2012-010402
Application 10/975,277

1    CONCLUSIONS OF LAW

2    The rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under

3    35 U.S.C. § 103(a) as unpatentable over McCall and official notice as

4    evidenced by Ikeda is proper.

5    The rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 under

6    35 U.S.C. § 103(a) as unpatentable over McCall and Nicholson and official

7    notice as evidenced by Ikeda is proper.

8    DECISION

9    The rejection of claims 1-4, 7-12, 14-16, 20-25, 29-32, and 34-36 is

10   affirmed.

11   No time period for taking any subsequent action in connection with this

12   appeal may be extended under 37 C.F.R. § 1.136(a).  *See* 37 C.F.R.

13   § 1.136(a)(1)(iv).

14

15   AFFIRMED

16
17
18
19   mp

13

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on November 18, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Nathan K. Kelley
Frances Lynch
Lore A. Unt
UNITED STATES PATENT
  AND TRADEMARK OFFICE
  OFFICE OF THE SOLICITOR
P.O. Box 1450, Mail Stop 8
Alexandria, VA  22213
(571) 272-9035

*Counsel for Appellee*

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES
421 East Franklin Street, Suite 230
Richmond, VA  23219

**<u>CERTIFICATE OF COMPLIANCE</u>**
**With Type-Volume Limitation, Typeface Requirements,**
**And Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>11,237</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.


Dated: November 18, 2013            <u>/s/ Roberta Jacobs-Meadway</u>
                                    Roberta Jacobs-Meadway

                                    **Attorney for Appellants**